CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

FEB 27 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

ROY M. TERRY, JR., et al.,

*Plaintiffs,*

v.

VIRGINIA M. JUNE, Guardian for
ROBERT F. JUNE, SR.,

*Defendant.*

CIVIL ACTION NO. 3:03CV00052

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Before the Court is the Defendant's Motion for Reconsideration of Interlocutory Order on Choice of Law, filed on October 31, 2005. In this motion, the Defendant, Virginia M. June, Guardian for Robert F. June, Sr., moves the Court to reconsider and amend its order of February 23, 2005 in which presiding United States District Judge James Michael held that federal common law, in the form of the Uniform Fraudulent Transfer Act, would govern the Receiver's claim of fraudulent conveyance. *See Terry v. June*, 359 F. Supp. 2d 510 (W.D. Va. 2005). The Receiver opposes this motion and oral arguments have been heard on the matter. The issue, therefore, is ripe for decision. For the reasons discussed below, the Court will grant the Defendant's motion.

## I. Procedural Background

The Receiver brought this action under Section 22(a) of the Securities Act of 1933, 15

1

U.S.C. § 77v(a) and Section 2 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. The Reciever is acting pursuant to the designation of the Court and under the aegis of the overarching civil action *Securities and Exchange Commission v. Terry L. Dowdell*, Case No. 3:01CV00116, to recover funds illegally disbursed by Dowdell while operating a Ponzi scheme in violation of the Acts. Sections 77v(a) and 78aa vest in the federal courts exclusive jurisdiction over all suits in law and equity brought to enforce any liability or duty created by the Acts. This court, therefore, has a special brand of pendant jurisdiction over the state-law claims set forth in the Receiver's complaint. Those claims are unjust enrichment (Count One), accounting of funds (Count Two), money had and received (Count Three), and fraudulent conveyance of property (Count Four).

On July 2, 2004, the Receiver filed a Motion for Partial Summary Judgment wherein he moved the Court to, *inter alia*, establish that the choice of fraudulent conveyance law is determined under the laws of the forum state and that this points to Michigan's version of the Uniform Fraudulent Transfer Act ("UFTA") as the applicable law. In the alternative, the Receiver argued that the UFTA should be applied pursuant to federal common law. On February 23, 2005, the late Judge Michael determined that federal common law, in the form of the UFTA, applied to the case. On March 4, 2005, the Defendant moved the Court to amend its order and certify the choice of law issue for appeal. The Court denied that motion on April 5, 2005. On August 25, 2005, this case was reassigned to the undersigned United States District Judge. The Defendant then filed a motion on October 31, 2005 in which he moved the Court to reconsider the earlier choice of law ruling.

**II. Factual Background**

2

The factual background surrounding the Ponzi scheme operated by Terry L. Dowdell is familiar to the Court. Beginning in April 1998 and continuing through 2001, Dowdell operated a classic Ponzi scheme through a Bahamian based corporation known as the Vavasseur Corporation ("Vavasseur"). Dowdell marketed Vavasseur to investors as a business entity involved in trading medium-term debentures and other private bank debt. To perpetuate his scheme, Mr. Dowdell would simply use the money contributed by the newest investors to pay earlier investors their promised "profits." He would then misappropriate the remaining funds, transferring at least $29 million to business associates, family, and friends. In January 2001, the Securities and Exchange Commission ("SEC"), later joined by the Federal Bureau of Investigation, initiated an investigation into the Vavasseur program. The investigation to date has identified at least seventy-six direct investors, with an undetermined number of subinvestors, who contributed to the fraudulent investment program. While the exact amount of investors' loss is as yet unknown, it is estimated to exceed $121 million.

To facilitate recovery of these losses, Judge Michael appointed Roy M. Terry, Jr. and the law firm of DuretteBradshaw PLC as Receiver for Terry L. Dowdell and his various business entities. The Receiver filed this action against the Robert F. June, Sr., on June 10, 2003, asserting claims of unjust enrichment and fraudulent conveyance.[1] The Receiver claims that the Defendant was a Vavasseur investor, but that unlike many such investors, the amount of his investment was repaid in full. In addition to the recovery of investment principal, the Receiver asserts that he received substantial "earnings" on his Vavasseur investment and that he knew or

---

[1]By order of January 30, 2004, United States Magistrate B. Waugh Crigler substituted Virginia June, daughter and guardian of June, Sr., as the Defendant in this case. A Michigan probate court has declared June, Sr., to be an incapacitated person due to his dementia.

should have known that these "profits" were the proceeds of a scheme to defraud subsequent investors rather than genuine investment profits.

The facts relevant to the choice of law issue are largely not in dispute. From April 1998 through March 2000, Dowdell operated Vavasseur out of Florida, where he lived. In March 2000, Dowdell moved his residence and place of business to Charlottesville, Virginia, where he continued to operate Vavassuer. From April 1998 through March 2001, investor funds were initially deposited into accounts under Dowdell's control at Amsouth Bank in Largo, Florida. Dowdell retained direct control over Vavasseur until March, 2001, when, in an attempt to stop an investigation by the United States Securities and Exchange Commission ("SEC"), he purportedly transferred his interest in Vavasseur to a third party and told the SEC that he had repaid all U.S.-based investors. Despite these representations, Dowdell continued to operate Vavasseur through his associates in the United Kingdom, Shindar Gangar and Alan White. Also, Dowdell stopped using the Amsouth Bank accounts at this point, although he continued accepting investor funds at foreign banks and U.S. accounts under his control at Chase Manhattan Bank in New York and Bank of America in Virginia.

After November 2001, Vavasseur investors were directed to wire their investments to accounts in Guernsey, the Commonwealth of Dominica, Israel, and Ireland. From this point on, all distributions made to Vavasseur investors were made from foreign bank accounts.

On November 19, 2001, the SEC filed a civil enforcement suit against Dowdell and moved to freeze the foreign bank accounts identified from Vavasseur's financial records. This freeze created severe cash flow problems for Vavasseur, leading it to promise investors in April 2002 that a reorganization would occur and cause yields to increase to over 100% per annum.

4

This reorganization never occurred and the Vavassuer Ponzi scheme soon collapsed.

The Defendant began investing in Vavasseur in November 1999. Between November 1, 1999 and February 9, 2001, he invested a total of $500,000 in Vavassuer. On December 8, 1999, the Defendant received the first of several checks drawn on Dowdell's Florida bank account. These checks were mailed from Dowdell's Florida office to the Defendant's address in Michigan. The Defendant continued to receive checks and wire transfers from Dowdell's Florida bank account after Dowdell moved to Virginia in March 2000. By March 7, 2001, the Defendant had received fifteen profit distributions amounting to $312,862.50.

On March 21, 2001, the Defendant's principal was returned in connection with Dowdell's attempt to convince the SEC that Vavassuer was no longer dealing with funds from U.S. investors. However, on March 22, 2001, the Defendant reinvested his $500,000 principal by sending it through an intermediary bank account in the Bahamas under the control of VRJ, Ltd.[2] On August 8, 2001, Dowdell sent the Defendant a $36,000 profit distribution. This distribution was not sent directly to the Defendant. Instead, it was sent to VRJ, Ltd.'s account in the Bahamas. The Defendant then received this distribution as a payment from VRJ, Ltd. on August 15, 2001. On December 20, 2001, June, Sr., recovered his $500,000 investment principal. By that time he had received a total of $348,862.50 in Vavasseur profit distributions.

## III. Motion to Reconsider

### A. Judge Michael's Choice of Law Decision

The Defendant moves the Court to reconsider the choice of law determination made by

---

[2]VRJ, Ltd. was a corporation based in the Bahamas and owned by Robert F. June, Jr. (the Defendant's son), Virginia June, and Cody June (Virginia June's son).

5

Judge Michael on February 23, 2005. In that decision, Judge Michael eschewed the traditional two-step choice of law inquiry, whereby a court first determines the applicable choice of law rule and then applies it to the facts of the case, and found that application of substantive federal common law was appropriate in this case. Judge Michael's opinion began by recognizing the command of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), that federal courts apply state law to state law claims over which they have jurisdiction. The opinion also acknowledged that cases where a court may fashion a federal rule of decision are "few and restricted" and limited to those instances presenting a "significant conflict" between federal interests and the application of state law. *Terry*, 359 F. Supp. 2d at 517-518 (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994)). However, Judge Michael went on to find that the instant case presented such a conflict, thereby justifying the use of federal common law over claims which would otherwise be grounded in state law. *Id.* at 518.

Judge Michael's opinion cited three ways in which federal interests were at odds with application of state law. First, the Court reasoned that there was a "strong need for uniformity in the treatment of the Receiver's various claims against those who allegedly received fraudulent transfers from the Dowdell fraud scheme." *Id.* at 518. The fact that investors were located in as many as 26 states and foreign countries created the possibility that, absent a uniform rule, those who made similar investments would be treated differently. *Id.* The Court found that this possibility, which would allow some investors to retain their profits while forcing others to disgorge them, was unfair, illogical, and contrary to the federal interest in consistent enforcement of federal securities laws. *Id.* Second, the Court reasoned that application of diverse state and foreign laws could at times frustrate the ability of the Receiver to recover assets for distribution

6

to Vavasseur's victims because some laws might make fraudulent conveyances harder to set aside than the UFTA would. *Id.* Such variation, moreover, would increase litigation expenses and diminish the pool of assets available for distribution. *Id.* Finally, the Court reasoned that even if these "uniformity" and "more money" arguments were not sufficient in themselves, there was a significant enough federal interest at stake to tip the scales. *Id.* Specifically, the Court found that there was a strong federal interest because the Receiver was appointed by federal court, pursuant to federal laws, and performed federal functions by facilitating the SEC's enforcement of federal securities laws. *Id.* The Court also found precedent for this position in *Bryan v. Bartlett*, 435 F.2d 28, 32-33 (8th Cir. 1970), a case in which the Eighth Circuit held that application of federal common law was appropriate in SEC receivership proceedings because they involved receivers performing federal functions in the enforcement of federal securities laws.

The Defendant now argues that the Court should reconsider Judge Michael's decision to use federal common law, arguing that this decision is clearly erroneous according to precedent in *O'Melveny & Myers,* 512 U.S. at 87, and *Atherton v. FDIC*, 519 U.S. 213, 219 (1997). The Receiver objects to the Defendant's motion, arguing primarily that the Court should not reconsider Judge Michael's decision because it is the established "law of the case," in accordance with which the Receiver has conducted its discovery efforts.

*B. Discussion*

"An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991). A court's decision to reconsider an interlocutory order is "not subject to the strict

standards applicable to motions for reconsideration of a final judgment," but is instead committed to the discretion of the court. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-515 (4th Cir. 2003) (citing 12 Moore's Federal Practice § 60.23). The law of the case doctrine, furthermore, has evolved as a means of guiding a court's discretion and cannot limit the power of a court to reconsider its earlier ruling. *Id.* at 515.

Given the discretion invested in this Court to reconsider its earlier decisions, the Court is not persuaded that the law of the case doctrine should prevent the reconsideration of a decision contrary to fundamental constitutional jurisprudence. Failure to reconsider such a decision would likely lead to a reversal on appeal, an outcome certainly not in the interests of either party in this already messy and protracted case. The better approach in this case is to correct any erroneous rulings before final judgment.

Having thoroughly reviewed this matter, the Court is convinced that Judge Michael's choice of law decision is contrary to precedent established by the Supreme Court in *O'Melveny* and *Atherton* and, therefore, must be amended.

As Judge Michael's decision itself noted, the interests of uniformity and facilitation of the Receiver's recovery efforts are not by themselves sufficient to permit the application of a rule of decision based on federal common law. The Supreme Court evaluated these rationales specifically in *O'Melveny*. That case dealt with whether, in a suit by the FDIC as receiver for a federally insured bank, federal common law or state law governed the issue of whether corporate officers' knowledge of wrongdoing could be imputed to the corporation, and consequently to the FDIC acting as receiver. The Court first dispensed with the argument that uniformity, needed to facilitate the FDIC's nationwide litigation, presented a sufficient basis for applying federal

8

common law to this issue. Characterizing uniformity as " that most generic . . . of alleged federal interests," the Court reasoned that if it were to qualify as an identifiable federal interest courts would be left awash in federal common law. *Id.*

The Court also rejected the FDIC's argument that federal common law must govern the imputation of knowledge because state law unfavorable to its position might deplete the deposit insurance fund and thereby jeopardize federal interests. *Id.* Because there was no federal policy that the FDIC should always win, the Court found that there was no basis for adopting a federal rule which would arbitrarily eliminate a defense granted by state law and lead to the creation of new federal common law actions. *Id.*

Finally, the Court in *O'Melveny* did not find that there was a federal interest present by virtue of the FDIC being receiver. It noted that "the FDIC is not the United States, and even if it were we would be begging the question to assume that it was asserting its *own* rights rather than, as receiver, the rights of [the failed bank]." *Id.* at 85. The Court reiterated this distinction in *Atherton*, 519 U.S. at 225, and noted that even though the FDIC was acting as a receiver over the failed institution, as was the case in *O'Melveny*, it was not pursuing the federal government's interests *per se*.

In light of the above authorities, it is clear that Judge Michael's reasoning does not withstand scrutiny. Although the Court is well aware of the fact that uniform treatment of the Receiver's claims would facilitate recovery of receivership funds and lead to consistent treatment of those investors alleged to have received fraudulent conveyances, these interests are not sufficiently compelling in light of *O'Melveny* and *Atherton*. Nor are the interests at stake in this case federal in character. Like the FDIC in *O'Melveny* and *Atherton*, the Receiver here is not

9

pursuing federal interests *qua* federal interests. Rather, the Receiver in this case is only suing to redress injuries caused to the entity in receivership. *See Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995). Nor does the fact that the Receiver was appointed by a federal court pursuant to federal laws transform the private interests at stake into interests federal in nature. If that were the case, then the Court's decisions in *O'Melveny* and *Atherton*, which involved the FDIC acting as receiver pursuant to a federal statute, *see* 18 U.S.C. § 1821(d)(2)(A)(1), would hardly make sense.

Because the Court does not find a significant conflict between federal interests and the application of state law, it will grant the Defendant's motion and decline to apply federal common law to the Receiver's claims. The Court must now determine which body of law appropriately applies to these claims.

## IV. Which Law Applies?

### A. *Federal or State Choice of Law Rules*

As stated above, a United States District Court's choice of law inquiry traditionally occurs as a two step process. First, the court must determine whether federal or state choice of law rules govern. Second, once the court has determined which choice of law rules apply, it must apply these rules to the facts of the case to determine the appropriate substantive laws.

A federal court exercising diversity or pendent jurisdiction over state law claims must apply the choice of law rules of the forum in determining which law governs those claims. *Klaxon Company v. Stentor Electric Manufacturing, Co., Inc.*, 313 U.S. 487 (1941); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988); and *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d

10

Cir. 1977). This rule is based on the recognition that the holding of *Erie v. Tompkins* extends to the field of conflict of laws because federal choice of law rules are themselves a species of federal common law. *See Klaxon*, 313 U.S. at 496 ("It is not for federal courts to thwart [state] policies by enforcing an independent 'general law' of conflict of laws."); and *In re Gaston & Snow*, 243 F.3d 599, 601-602 (2nd Cir. 2001) ("[F]ederal choice of law rules are a type of federal common law."). Despite this general prohibition on applying federal choice of law rules to state law claims, the Fourth Circuit has indicated that the presence of a "compelling federal interest which dictates otherwise" may justify departure from the rule established in *Klaxon*. *See In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988) (holding that "in the absence of a compelling federal interest which dictates otherwise, the *Klaxon* rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest."). At issue, therefore, is whether there exists a compelling federal interest in this case sufficient to justify application of federal choice of law rules.

The Receiver contends that there is no such federal interest in this case. The clear thrust of *Klaxon* and *In re Merritt Dedging*, he argues, is that the source of the right sued upon, rather than the source of the court's jurisdiction, governs whether state or federal choice of law rules apply to a given claim. The Receiver goes on to point out that the claims pled are exclusively state law causes of action, thereby requiring the application of Virginia's choice of law rules.

The Receiver also seeks to distance himself from *SEC v. Infinity Group*, 27 F. Supp. 2d 559 (E.D. Pa. 1998), a case upon which he has relied in other proceedings for the proposition that federal choice of law rules may govern state fraudulent conveyance claims in SEC receivership actions. *See e.g.* Receiver's Memorandum of Points and Authorities in Support of Motion for

11

Summary Judgment in *Roy M. Terry, Jr. v. Timothy M. Pierce*, Case No. 3:03CV00046 at 6; *Roy M. Terry, Jr. v. Nona Marie Pierce*, Case No. 3:03CV00053 at 7. The context in *Infinity Group* is similar to the instant case in that it too involved state fraudulent conveyance claims brought by a receiver in a proceeding ancillary to a SEC enforcement action. In deciding whether state or federal choice of law rules applied to the fraudulent conveyance claims, the court there concluded that federal choice of law rules applied because the court was sitting pursuant to federal question jurisdiction. *Infinity Group*, 27 F. Supp. 2d at 564. Despite having previously relied on the holding in *Infinity Group*, the Receiver now contends that this decision was wrong and would not comport with *In re Merritt Dredging*.[3] He also points out that, contrary to purported federal question jurisdiction in *Infinity Group*, the instant case is before the Court as a matter of pendent jurisdiction. The Defendant, on the other hand, maintains that the Receiver is simply trying to manipulate choice of law principles from case to case and urges the Court to follow *Infinity Group* and apply federal choice of law rules.

Before being decided by Judge Michael in February 2005, this choice of law question was heard by Magistrate Crigler. In his Report and Recommendation of December 14, 2004, the Magistrate recommended that the Court follow *Infinity Group* and use federal choice of law rules. The Magistrate found that SEC enforcement actions implicate federal interests and necessitate independent federal judgment in choice of law inquiries. He noted that because Ponzi

---

[3] The Receiver argues that the cases that the court in *Infinity Group* relied on for its choice of law holding are either inapposite or contrary to Fourth Circuit law. For example, the court in *Infinity Group* cited *In re Lindsay*, 59 F.3d 942 (9th Cir. 1995), a bankruptcy case in which the Ninth Circuit held that federal courts should apply federal choice of law principles to state law issues in cases over which federal courts exercise exclusive jurisdiction. The Fourth Circuit, the Receiver points out, came to the contrary conclusion in *In re Merritt Dredging*.

schemes may be orchestrated across state lines, there is no guarantee that the forum for the enforcement action will be the exclusive federal forum for these and related proceedings. If federal courts were bound to apply their forum's choice of law rules, different laws might be applied based on where the Receiver ultimately brings suit. On the other hand, if federal choice of law rules were applied in such cases, receivers would be free to pursue claims in multiple jurisdictions knowing that consistent, uniform application of federal choice of law rules would reduce litigation expenses and reduce the risk of having multiple, contradictory choice of law determinations. These factors, in the Magistrate's judgment, implicated federal interests because of the great authority that securities laws invest in receivers to pursue receivership assets.

In deciding this issue, the Court finds that this case does not present a federal interest sufficiently compelling to justify departure from the rule in *Klaxon* and *In re Merritt Dredging*. Although the use of federal choice of law rules throughout the Receiver's cases would tend to promote uniformity and predictability in the selection of substantive law and thereby protect receivership funds from added litigation expenses, these interests are neither federal in nature nor sufficiently compelling. First, as discussed above, the Supreme Court dealt with the interest in uniformity in *O'Melveny* and *Atherton* and found that it could not justify the replacement of a state rule with a federal rule. Although these cases evaluated the uniformity interest in the context of applying federal *substantive* common law rather than federal choice of law rules, this distinction is of no import. For one, the holdings *O'Melveny* and *Atherton* were ultimately grounded in the requirements of *Erie v. Tompkins*, which the Supreme Court extended specifically to the realm of choice of law in *Klaxon*. This holding is a recognition that federal choice of law rules are themselves a species of federal common law. *See In re Gaston & Snow*,

243 F.3d at 601-602, and *A.I. Trade Fin. v. Petra Int'l Banking Corp.*, 314 U.S. App. D.C. 122 (D.C. Cir. 1995). This convinces the Court that when the interest of uniformity is insufficient to justify application of federal substantive common law it should also be insufficient for applying federal choice of law rules. Also, while application of federal choice of law rules might reduce litigation expenses and facilitate the Receiver's multijurisdictional litigation efforts, this interest is not federal in character. The Receiver, despite being appointed by a federal court and exercising powers defined by federal law, is pursuing the private interests of Vavasseur and its defrauded investors rather than the interests of the federal government as a regulator of the U.S. securities market. *See, e.g., O'Melveny*, 512 U.S. at 85; *Atherton*, 519 U.S. at 225; and *Scholes*, 56 F.3d at 753.

Finally, the Court is convinced that the Fourth Circuit would find the field of securities regulation analogous to bankruptcy for the purposes of applying federal choice of law rules. Both fields involve federal statutory schemes which often incorporate matters or claims originating in state law. *See, e.g., In re Merritt Dredging Co.*, 839 F.2d 203; and *SEC v. Antar*, 120 F. Supp. 2d 431 (D.N.J. 2000). With respect to the bankruptcy context, the Fourth Circuit in *In re Merritt Dredging Co.* determined that these matters should be governed by state choice of law rules. This holding clearly indicates that the fact that a federal statutory scheme operates in the background of a case will not justify the application of federal choice of law rules to matters which are creatures of state law. That being the case, the *Klaxon* rule should apply to the Receiver's claims. They originate exclusively in state law and arise in a case which is ancillary to the principal SEC enforcement action and in which there are no issues of federal law. The state law claims here, in other words, bear the same relationship to federal law as the property

14

questions in *In re Merritt Dredging Co.* did. The Receiver's claims should therefore receive similar treatment.

Thus, the Court finds that federal choice of law rules are inapplicable to the Receiver's claims and that Virginia's choice of law principles will govern them.

*B. Application of Virginia's Choice of Law Rules*

The first step in applying Virginia's choice of law rules is to determine how Virginia would characterize the claim of fraudulent conveyance for choice of law purposes. *See* 16 AM. JUR. 2D *Conflicts of Law* § 3, at 12 (1998). How Virginia would classify a fraudulent conveyance is a matter of first impression. The Receiver contends, and the Defendant appears to concede, that it should be treated as a claim sounding in tort.

Classification of fraudulent conveyance is not a completely straightforward matter. On the one hand, a claim of fraudulent conveyance resembles an action in tort in that the ultimate issue is not whether the conveyance from grantor to grantee was formally valid as a matter of property law, but rather whether it was done for the purposes of defrauding one's creditors. Many courts and a number of leading commentators have agreed with this approach and have classified these claims as sounding in tort. *See, e.g., RCA Corp. v. Tucker*, 696 F. Supp. 845, 853 (D.N.Y. 1988); *Midlantic Bank, N.A. v. Strong*, 1996 U.S. Dist. LEXIS 22384, at *21-22 (E.D.N.Y. 1996); *Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp.)*, 179 B.R. 457, 469-470 (Bankr. E.D. Pa., 1995); Leflar, AMERICAN CONFLICTS LAW § 185 at 380 n.6 (3d ed. 1977) (approving "tort characterization" in determining "law governing validity of allegedly fraudulent or preferential transfers and assignments"). On the other hand, a number of courts have rejected this tort characterization, holding that fraudulent conveyance claims sound in

15

equity because they seek the equitable remedy of voiding a conveyance rather than damages. *See, e.g., In re Kaiser Steel Corp.*, 87 B.R. 154, 159 (Bankr. D. Colo. 1988); *United States v. Franklin Nat'l Bank*, 376 F. Supp. 378, 383 (D.N.Y. 1973); and *Federal Deposit Ins. Corp. v. Martinez Almodovar*, 671 F. Supp. 851, 871 (D.P.R. 1987). The Court, however, finds that a claim of fraudulent conveyance under Virginia law falls into the sphere of torts. Fraudulent conveyance goes beyond questions of property law since such a conveyance is "valid between the parties, and in fact as to the whole world, except those within the protection of the statutes." *Catron v. Bostic*, 123 Va. 355, 371 (1918) (quoting 3 Am. St. Rep. 717, 727-745). Such a conveyance, in fact, is valid even as to creditors until they seek protection provided by law. *Id.* The purpose of a fraudulent conveyance claim is not to determine whether the transfer was void *ab initio*, but rather it is to determine whether the debtor's actions amounted to a fraud on a creditor, allowing him to recover property notwithstanding its transfer. *See id.* This focus on the improper and fraudulent character of the debtor's conduct and the injury caused to his creditors places these claims most appropriately in tort law. These claims will therefore be treated as sounding in tort for choice of law purposes.

It is well established under Virginia law that actions sounding in tort are governed by the law of the place of the wrong, a principle known otherwise as *lex loci delicti. McMillan v. McMillan*, 219 Va. 1127, 1128 (1979); and *Maryland use of Joynes v. Coard*, 175 Va. 571 (1940). It is also established that the place of the wrong for choice of law purposes is the place where "the last event necessary to make an [actor] liable for an alleged tort takes place." *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (quoting *Miller v. Holiday Inns, Inc.*, 436 F. Supp. 460, 462 (E.D. Va. 1977)). No Virginia court has determined where the

16

last act necessary to complete a fraudulent conveyance takes place.

The major point of the Receiver's argument is that the last act necessary to complete the tort of fraudulent conveyance is the irrevocable delivery or acceptance of funds by the transferee, not the transferor's order to pay out investor funds. Without a transferee to accept a transfer of funds, in other words, there can be no conveyance and therefore no liability created. Such analysis would place the focus on the Defendant's actions and location. With respect to Dowdell's payments to the Defendant by check, the Receiver argues that this delivery of money became irrevocable and complete when the Defendant's Michigan bank honored the check. As to payments occurring by wire transfer, he maintains that the fraudulent conveyance was completed when the Defendant's bank accepted the wire transfer. The Receiver argues that both of these events occurred at the Defendant's Michigan bank, thereby leading to the application of Michigan's substantive law.[4] In contrast to the Receiver's focus on the transfers themselves, the Defendant maintains that the emphasis should be on Dowdell's actions in transferring investor funds rather than on his own actions in receiving them. This, the Defendant contends, would lead to the application of Virginia law due to Dowdell's orchestration of these fraudulent transfers from Virginia.

Finally, Magistrate Crigler recommended in his Report and Recommendation that the Court should focus not on Virginia's law of fraudulent conveyance, but rather on the applicable Virginia law governing completion of the transactions. Such law would determine where the

---

[4]The Receiver does not argue that Bahamian law should apply to the August 2001 funds transfer to VRJ, Ltd.'s bank account in the Bahamas, although he does forewarn of such a possibility if Virginia's law of *lex loci delicti* is found to apply. *See* Receiver's Motion for Partial Summary Judgment at 32-33.

transaction was completed and, therefore, where the tort occurred. The Magistrate pointed out

that pursuant to VA. CODE ANN. § 8.4A-104(a), any conveyance by wire transfer would be

"completed by acceptance by the beneficiary's bank of a payment order for the benefit of the

beneficiary of the originator's payment order." Under such law, the Magistrate found that

Virginia's rule of *lex loci delicti* would lead to the application of the law of Michigan, where the

Defendant's bank accepted the transfer of Vavasseur funds.[5]

Virginia law is unclear as to when a fraudulent conveyance is complete. However, the

Court finds that the answer must be found not by applying Virginia's law of fraudulent

conveyance, but rather by applying the law determining completion of the transaction in

question. This approach is appropriate because, as the Receiver contends, looking to Virginia's

substantive law of fraudulent conveyance in order to determine which state's law of fraudulent

conveyance applies would in fact put the cart before the horse. Moreover, looking to the place

where the transaction between Dowdell and the Defendant was completed comports with

Virginia's focus on the "last act" necessary to create a tort. A fraudulent conveyance can hardly

occur unless the conveyance has come to completion. The Defendant's focus on Dowdell's

lcoation, on the other hand, would not comport with the rule of *lex loci delicti* because it looks to

the initiation, or first act of the fraudulent conveyance, rather than to the last act in its

completion.

The conveyances alleged to be fraudulent were completed by wire transfer and check.

---

[5]Not included in the Magistrate's findings are two points of importance: (1) whether his analysis would also lead to Bahamian law applying to the August 2001 transfer to VRJ, Ltd.'s bank account in the Bahamas; and (2) which law would apply to payments made by check rather than wire transfer.

Case 3:03-cv-00052-NKM-BWC   Document 157   Filed 02/27/06   Page 18 of 23   Pageid#: 1114

The issue, therefore, becomes where transactions in these forms are deemed completed under Virginia law. As Magistrate Crigler noted, VA. CODE ANN. § 8.4A-104(a) states that a funds transfer is "completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order." The Court agrees with Magistrate Crigler that this provision would clearly result in the application of Michigan law to transfers directed by Dowdell to the Defendant's Michigan bank account.

A different result, however, obtains as to transfers made by check payments. As an initial matter, it should be noted that the Defendant's reliance on Virginia as the location from which Dowdell mailed the checks is simply inapposite because that act alone did not irrevocably convey Vavasseur monies. That much is clear because "[a] check or other draft does not of itself operate as an assignment of funds in the hands of the drawee available for its payment. . ."VA. CODE ANN. § 8.3A-408. By the same token, it is also inapposite that the Defendant received the checks from Dowdell in Michigan.

Since the delivery of the checks themselves did not assign Vavasseur funds to the Defendant, the issue then becomes what act did effectuate the assignment. According to the Virginia Supreme Court's holding in *Woo v. Smart*, 247 Va. 365, 369-370 (1994), an irrevocable assignment occurs when the drawee bank honors and pays the drawer's check. Although the issue in *Woo* concerned whether delivery of a check from a decedent to a donee constituted delivery of a gift for purposes of establishing a gift causa mortis, the Court finds that the holding in *Woo* is applicable to the instant case. In *Woo*, an extremely ill decedent gave his longtime girlfriend three personal checks payable to her two days before his death. *Id.* at 368. The donee girlfriend did not present any of these checks for deposit until the day after the decedent donor

19

died. *Id.* Litigation ensued, with the administrator of the decedent's estate claiming that the donee had no right to the check proceeds as a gift causa mortis. The trial court agreed, finding that the fourth element of a gift causa mortis, delivery and acceptance of the gift property, never occurred. *Id.* at 693. The court reasoned that this was so because "delivery of the checks did not constitute delivery of the object of the gifts themselves; that is, the money in the bank." *Id.* The Virginia Supreme Court affirmed this ruling on appeal and noted:

> Until the check is paid, the donor retains control and dominion over the funds and the gift is incomplete; the donor could stop payment or write another check for the funds payable to a third person, or the donor may die, thus revoking the donor-drawer's command to the drawee bank to pay the money.

*Id.* at 370 (citing *Sturgill v. Virginia Citizens Bank*, 223 Va. 394, 398 (1992)). Delivery of the money, in other words, was incomplete "prior to acceptance or payment by the bank. . ." *See id.* at 369.

Under *Woo*, it is clear the last act necessary to complete Dowdell's check conveyances to the Defendant did not occur when Dowdell mailed those checks or when the Defendant deposited them. Rather, the last act did not occur until Dowdell's bank accepted those checks. Until such time, Vavasseur funds had not been irrevocably assigned to the Defendant because a myriad of events could have occurred to prevent the Defendant from receiving the money. For example, Dowdell could have closed his bank account or he even could have died, revoking his command to the drawee bank to pay the money. *See, id.* at 370; and *Sturgill*, 223 Va. at 398. But as soon as his bank accepted the checks it became liable to pay them, thereby giving the Defendant an irrevocable interest in the funds. *See* VA. CODE ANN. § 8.3A-408 ("[T]he drawee is not liable on the instrument until the drawee accepts it). These payments, moreover, occurred at Dowdell's

20

bank because Virginia law specifies that "an instrument is payable at the place of payment stated in the instrument." VA. CODE ANN. § 8.3A-111. Because the Court finds that the last act of a fraudulent conveyance by check payment occurs when the drawee bank honors the check, the *lex loci delicti* for choice of law purposes will be the location of the drawee bank. Accordingly, whether a particular conveyance made by check is fraudulent or not will be determined in accordance with the laws of the state wherein the drawee bank is situated. Thus, Florida law will govern conveyances made by checks drawn on Dowdell's Florida bank account.

An interesting and perhaps more difficult issue arises with respect to the August 2001 transfer of $36,000. Unlike the other profit distributions made to the Defendant, the August 2001 transfer was initially sent to the Bahamian bank account of VRJ, Ltd., which then forwarded the sum on to the Defendant's account in Michigan. A mechanical application of *lex loci delicti* and § 8.4A-104(a) would lead the Court to apply the Bahamian law of fraudulent conveyance to this transaction. Neither party has advocated the application of Bahamian law, nor have they briefed its substantive provisions to the Court. However, the Court is aware that the Bahamian law has a reputation for being very debtor-friendly with respect to fraudulent conveyances, to the point where the Bahamas has been used as a jurisdiction to shield funds from creditors. *See, e.g.,* David C. Lee, *Offshore Asset Protection Trusts: Testing the Limits of Judicial Tolerance in Estate Planning*, 15 Bank. Dev. J. 451, 458 (1999); Jonathan L. Merzich, *It's Better in The Bahamas: Asset Protection Trusts for the Pennsylvania Lawyer*, 98 Dick. L. Rev. 657, 667 (1994); Elena Marty-Nelson, *Offshore Asset Protection Trusts: Having Your Cake and Eating It Too*, 47 Rutgers L. Rev. 11, 57 (1994). A mechanical application of the *lex loci delicti* rules, therefore, presents two risks in this context. First, there is the possibility that Bahamian law might be

contrary to fundamental forum public policy respecting the ability of creditors to recover funds that have been fraudulently transferred away. Second, there is the risk that blindly applying such law might, in effect, give transferee's of fraudulent conveyances the ability to unilaterally "choose" the applicable fraudulent conveyance law by structuring their transactions in a way that lead to the application of the desired body of law. That risk is especially apparent in cases where investment conduits are established in countries that have debtor-friendly laws and which otherwise bear no legitimate relationship to the transferee.

The Court is of the opinion that these two risks, depending on the substance of Bahamian law, could lead a Virginia court deciding this matter to eschew application of Bahamian law on public policy grounds. It is well established that although Virginia courts will frequently apply foreign substantive law as a matter of comity, they will not do so if this would contravene fundamental policy interests of the forum. *See, e.g., Willard v. Aetna Casualty & Surety Co.*, 213 Va. 481, 483 (1973); *Maryland use of Joynes v. Coard*, 175 Va. 571, 578 (1940) (citing *Nelson v. Chesapeake & Ohio R.R. Co.*, 88 Va. 971 (1892); *C. I. T. Corp. v. Guy,* 170 Va. 16, 22 (1938); and 1 Michie's Jurisprudence, Conflict of Laws § 5. The Court declines to exercise this public policy exception at this time since the parties have not briefed the Court on the substantive provisions of Bahamian fraudulent conveyance law and on whether they conflict with Virginia's public policy. Unless and until the Court becomes convinced that Bahamian law would contravene Virginia public policy, Bahamian law will govern as to the August 2001 conveyance sent to VRJ, Ltd.

## V. Conclusion

In conclusion, for the reasons herein stated, the Court will grant the Defendant's Motion for

Reconsideration of Interlocutory Order on Choice of Law. The Court finds that Virginia's choice of law principles govern this case. With respect to alleged fraudulent conveyances made by wire transfer, the applicable law will be that of the jurisdiction wherein the receiving bank is located. Thus, wire transfers made to the Defendant's bank in Michigan will be governed by Michigan law and the August 2001 transfer to VRJ, Ltd.'s account in the Bahamas will be governed by Bahamian law. With respect to fraudulent conveyances made by check payments, the applicable law will be that of the jurisdiction wherein the drawee bank is located. Thus, Florida law will govern conveyances made by checks drawn on Dowdell's bank account in Florida. An opinion on the Receiver's Motion for Partial Summary Judgment of September 23, 2005 is forthcoming.

An appropriate order this day shall issue.

ENTERED:  _Norman K. Moon_
United States District Judge

_February 27, 2006_
Date

23